Argued April 9, affirmed May 14, petition for rehearing
denied June 18, 1958

# STATE OF OREGON *v.* HICKS

325 P. 2d 794

*William Frazier*, Deputy District Attorney for Clackamas County, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General for Oregon, and Winston L. Bradshaw, District Attorney for Clackamas County.

*William E. Love*, Portland, argued the cause for appellant. With him on the brief were Cake, Jaureguy, Hardy & Buttler, of Portland.

BRAND, J.

On 10 January 1957 the defendant Ralph M. Hicks and Paul R. Bailieaux were jointly indicted by the

grand jury of Clackamas County for the crime of burglary not in a dwelling. The charging portion of the indictment reads as follows:

"That said Ralph Marlyn Hicks and Paul Rowtan Bailieaux on or about the 10th day of December, A.D., 1956, in the said County of Clackamas and State of Oregon, then and there being, did then and there unlawfully and feloniously break and enter, by then and there cutting a hole in the wall thereof, a certain building, to-wit: Molalla Food Market located on Highway No. 211, 500 yards west of the city limits of Molalla, in said county and state, in which said building there was at said time kept certain personal property, to-wit: certain valuable goods and chattels, with intent then and there on the part of them, the said Ralph Marlyn Hicks and Paul Rowtan Bailieaux, to then and there unlawfully take and steal therein, and carry away, said personal property, to-wit: said goods and chattels, said act of defendants being, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

Defendant pleaded not guilty. Separate trials were held, the defendant being tried first. The State introduced its evidence and rested. The defendant presented no evidence. The defendant moved for a directed verdict of not guilty or in the alternative for an order withdrawing the charge of burglary and limiting the issue to a charge of attempted burglary. The motion was based upon the contention that there was no substantial evidence of guilt to go to the jury. Both motions were denied; exception was taken and allowed; the case was submitted to the jury and a verdict of guilty of burglary was returned. On 28 January 1957 the defendant was sentenced to the penitentiary for the maximum statutory period of five years.

On 2 April 1957 and within the time limited by ORS 168.040 the district attorney filed an information under the Habitual Criminal Act, ORS 168.010 et seq., charging the defendant with two previous convictions, to-wit: for the crime of robbery first degree committed in California, and for the crime of robbery committed in Washington, the conviction in California being in the year 1939 and the conviction in Washington in the year 1943. The defendant filed a motion to dismiss the information, which was denied, and then filed a demurrer which was overruled. Thereafter the defendant in open court admitted the alleged previous convictions. The court on 8 July 1957 vacated the judgment and sentence of 28 January 1957 and imposed a sentence of ten years upon the charge of burglary not in a dwelling. The defendant appeals.

This appeal may be divided into two separate parts; the first relating to the trial upon the burglary charge, and the second to the proceedings under the Habitual Criminal Act. We will first consider the issues raised concerning the trial for burglary. Defendant's assignment of error No. 1 is based upon the order of the trial court in denying a motion for a directed verdict of not guilty. As stated in defendant's brief:

"On this appeal defendant's exception to the ruling on the motion is limited to whether there existed sufficient evidence from which a jury could find beyond a reasonable doubt that an unlawful 'entry' with intent to steal or commit a felony was made by defendant or Bailieaux."

From the brief of the State, we read:

"Plaintiff submits that that portion of defendant's Bill of Exceptions designated Exception Number 1, and all matters pertaining thereto contained

in defendant's brief should be stricken from the record, and the Plaintiff so moves, on the grounds that the appeal from the judgment entered on January 28, 1957, was not properly perfected."

The State relies upon ORS 138.180, 168.060, and Rule 7 of this court. The first section cited relates to the duty of the clerk of the trial court to transmit specified papers to the clerk of this court within 30 days or within "such further time as such court or the judge thereof may allow * * *." ORS 138.180. The other cited section provides that sentences imposed under the Habitual Criminal Act are reviewable on appeal. Rule 7 of this court merely provides in detail for the transmission of papers from the trial court to this court on appeal.

It is the contention of the State that we are not authorized on this appeal taken from the judgment in the habitual criminal proceedings to consider alleged errors occurring at the original trial in the burglary case. The prosecutor suggests a very serious problem and one which may require legislative or judicial clarification at the proper time. He poses the following problem:

"* * * Suppose the defendant had been convicted of burglary and sentenced to the penitentiary and no appeal is perfected. Twenty months later the District Attorney files an Habitual Criminal Information, and the defendant is found to have previous convictions as alleged. The old sentence is then vacated and the new sentence imposed, and from this the defendant appeals. Should he be allowed to raise questions arising from the original trial? * * *"

It is argued that the right to appeal under ORS 168.060 does not give the defendant a right to include matters arising from the original trial unless he has perfected

an appeal from the judgment therein. It may be suggested that the answer to the problem posed by the prosecution is to be found in what was said in *State v. Durham*, 177 Or 574, 164 P2d 448. We quote:

"\* \* \* In our opinion, when the court disposed of the habitual criminal proceeding and entered final judgment of conviction, the defendant had the right of appeal therefrom and could review the entire proceedings commencing with the original prosecution. \* \* \*""

This pronouncement is not decisive of the question with which we are concerned. In *State v. Durham* the trial court imposed no sentence until after the habitual criminal case had been heard and determined. There was only one judgment from which an appeal could be taken. Under those circumstances, the defendant was of course entitled, on his appeal, to have a review of the proceedings had at the main trial. *State v. Durham* is not in point.

■ The hypothetical question raised by the prosecution should not be decided in this case because the facts do not present that question. True, the appeal papers in the burglary case have never reached this court and we would not judicially know that an appeal was ever taken except for the frank statement of fact in the brief of the State. The facts appear to be as follows: The defendant took an appeal from the five-year sentence of January 1957. Thereafter he was granted 30 days from 22 April 1957 in which to file his transcript and bill of exceptions. Previously and on 2 April 1957 the district attorney filed his information under the Habitual Criminal Act, which in legal effect amounted to a request that the judgment and sentence from which defendant was appealing be vacated and a new sentence for the crime of burglary be imposed.

Defendant apparently did not perfect his appeal from the first sentence but awaited the outcome of the habitual criminal proceedings and appealed from the second judgment of 8 July 1957. The section which immediately follows ORS 138.180 reads as follows:

"If the return is not made as provided in ORS 138.180, the appellate court may, on motion of the respondent and notice to the defendant, order the appeal to be dismissed unless for good cause it retains the appeal and requires the clerk of the court below to make a further return as to any matter affecting the merits that appears or is alleged to be omitted from the transcript." ORS 138.190.

Neither the judicial record nor the statement of the district attorney shows that any motion was made or served for dismissal of the first appeal or that any order of dismissal was ever made. If such motion had been made it would have raised two questions; first, whether it was necessary to take and perfect an appeal from the judgment of 28 January as well as from the judgment of 8 July in order to preserve the right of appeal on account of errors, if any, committed at the first trial, and second, if it was necessary to take such a double appeal, whether the court should for good cause shown "retain" the first appeal. We need not now say whether it was necessary to take two appeals in order to raise the question as to the correctness of the ruling on the motion for directed verdict at the first trial. We are confident that by some means the defendant was entitled to raise that question. He did appeal; it has not been dismissed, and in the interest of justice we shall consider that issue.

██ The evidence in this case convincingly establishes that the defendant and his accomplice deliber-

ately planned to burglarize Reid's Molalla Food Market. They were equipped with the tools of their trade, a gun, a flashlight and a hammer, the striking portion of which was taped to prevent noise in its use. Bailieaux worked with brace and bit to cut a hole through the west wall of the building, while the defendant stood on watch a few feet away. The police had reason to believe that the two men would attempt to break and enter the building and several of them had concealed themselves therein. The hole was cut in the wall, after which the two burglars became alarmed and fled. The defendant admitted his part in the transaction. The only shadow of a reason for urging that the court erred in denying defendant's motion for a directed verdict is highly technical. Defendant contends that there was not sufficient evidence to go to the jury on the charge that defendant "broke and entered." Defendant acting by his admitted accomplice cut a hole in the west wall about eleven-and-a-half by twelve inches in size. We have read all of the evidence which has been authenticated by the certificate of the judge attached to the Bill of Exceptions. The jury was entitled to find that at least a hand carrying a flashlight was inserted through the hole, and that Bailieaux so operated the flashlight as to cast its beam against the inside of the west wall and the adjacent ceiling and around the room. Obviously it was done to enable the burglar to inspect the contents of the room, much of which he could not have seen without putting some portion of his body through the hole. We are of the opinion not only that the breaking and entry was a question for the jury, but that they properly resolved that issue against the defendant. The jury was clearly entitled to find that the breaking and entry was done with intent to steal. *Terminal News Stand, Inc. v.*

*General Casualty Co.*, 203 Or 54, 278 P2d 158, does not support the defendant's position. In that case the plaintiff brought an action on a policy of burglary insurance. The issue related to the definition of burglary which was contained in the policy and which differed materially from the statutory and common law definitions. It is therefore not in point, but the court said:

> "* * * It is true that within the meaning of the word entry as used in the law of burglary, 'It is not necessary that the party shall get his whole body into the house, and the least entry of any part of the body is sufficient.' 12 CJS 674, Burglary, § 10. * * *"

In Oregon the controlling statute expressly provides:

> "* * * Every unlawful entry of any building, booth, tent, railroad car, vessel, boat, or other structure or erection mentioned in ORS 164.240, with intent to steal or commit any felony therein, is a breaking and entering of the same within the meaning of ORS 164.240." ORS 164.220.

ORS 164.240 provides, in part:

> "Any person who breaks and enters any building * * * in which any property is kept, with intent to steal or to commit any felony therein, is guilty of burglary and shall be punished upon conviction by imprisonment in the penitentiary for not more than five years."

■ If a hole is made in the wall and a hand is thrust through it, the actor, then intending to complete the entry and steal property then in the building, is guilty of burglary. It is not necessary under our statute that he intend at the moment of such entry to then use his hand to seize and asport property.

In *State v. Chappell*, 185 SC 111, 193 SE 924, cited

with approval in our Terminal News Stand case, the court said:

"We think the court properly refused to direct a verdict. There was here, as testified, a wire screen nailed to the window over the lower sash. This screen was more than a mere protection against flies and mosquitoes; it was an enclosing part of the dwelling house. The corner of it, according to the evidence, was torn away by the defendant, who inserted his hand through the hole thus made and raised the window sash. This was not only a breaking, but was an entry sufficient in law to constitute burglary, if all the other elements of the offense were present—about which there is no contention."

To the same effect see 12 CJS 673, Burglary, § 10b.

Defendant cites *Commercial Travelers v. Williams*, 11 F2d 577 (6th Cir). This case resembles *Terminal News Stand v. General Casualty Co.*, supra, in that it was an action on an accident insurance policy. A casual reading of the case will show that it is not in point.

■ The defendant seeks to make a distinction between breaking and entering a dwelling house, on the one hand, and breaking and entering a building other than a dwelling, on the other. No such distinction has been made in our statutes and the common-law definition has been adopted in both situations. See *State v. Whitaker*, Mo., 275 SW2d 316 (1955), in which the common-law definition of "entering" was applied in the case of burglary not in a dwelling. We find no merit in the first assignment of error.

■ We now turn to the assignment of error relative to the proceedings under the Habitual Criminal Act. It is contended (1) that the defendant was denied the equal protection of law, (2) that the application of the Habitual Criminal Act results in punishment founded upon vindictive justice rather than reforma-

tion, thus violating Oregon Constitution, Article I, § 15, and (3) that it results in the imposition of punishment which is not in proportion to the offense, thus violating Constitution of Oregon, Article I, § 16. There is no merit in the contention that the habitual criminal law, as such, violates the provisions of Article I, § 15 of the Oregon Constitution, which provides that "Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice." Nor does the act as such violate the constitutional mandate that all penalties shall be proportioned to the offense. Constitution of Oregon, Article I, § 16.

Statutes which authorize a more severe penalty to be inflicted upon one convicted of a second or subsequent offense have been upheld in scores of well-reasoned judicial decisions and we deem is unnecessary to discuss the matter at any length. In view of the principles of modern penology, it would be a strange rule to hold that a court cannot follow an appropriate procedure for the purpose of determining the kind and character of a man upon whom sentence is to be imposed. This court follows a different rule. *State v. Moore*, 192 Or 39, 233 P2d 253; *Borders v. Alexander*, 183 Or 488, 194 P2d 414; *State v. Smith*, 128 Or 515, 273 P 323. And see 24 CJS 1145, Criminal Law, § 1959 (B), citing cases from more than half of the states of the Union and from the Federal Courts.

Counsel for the defendant earnestly and with evidence of considerable industry contends, in substance, that the defendant has been denied the equal protection of the laws because of the alleged discriminatory enforcement of the mandatory provisions of the Habitual Criminal Act. In support of this contention the defendant relies upon the testimony of Francis W. Linklater, district attorney of Washington County.

(The defendant Hicks was tried in Clackamas County.) Defendant also relies upon two letters signed by the warden of the penitentiary and addressed to counsel for the defendant, which were received in evidence without objection. Linklater testified that neither he nor his predecessor had brought any prosecutions in Washington County under the Habitual Criminal Act, though he said, "we have our share." He testified further that he attended the annual conference of district attorneys which was held in December 1956. The matter of the enforcement of the act was brought up by the district attorney of Clatsop County, who had been enforcing the act. Only about half of the district attorneys of the state were present. A show of hands indicated that they were not enforcing the act. No vote was taken as to their future course and no rule was adopted. Linklater testified that there had probably been 35 or 40 criminal prosecutions in 1957 in his county in which the defendants had previous felony convictions. Additional information was received from Mr. Frazier, the deputy district attorney for Clackamas County. He stated that since January 1, 1956, there had been 19 commitments to the state penitentiary. While the evidence is not clear, it appears that of the 19 commitments, seven had prior convictions. It also appears that in Clackamas County no one except the defendant Hicks had been sentenced under the act for seven years. There was, however, "no fixed and previously considered plan in regard to the enforcement" of the act.

Statistics furnished by the Warden of the penitentiary show that since January 1, 1956, 384 persons having one or more prior convictions were committed to the penitentiary and that only eight of them had received habitual criminal sentences. The statistics

also show that as of May 17, 1957 only 24 out of 984 inmates having prior convictions had been sentenced as habitual criminals.

■ The evidence in this case would seem to indicate extraordinary laxity in the enforcement of the law, for which no excuse is apparent. The statute now on the books provides:

"(1) If at any time within two years after conviction the district attorney of the county in which the conviction was had has reason to believe that the convicted person has previously been convicted within or without this state of any felony, he shall immediately investigate.

"(2) If, upon investigation, it is determined by competent evidence that the person has been so previously convicted, the district attorney shall immediately file an information accusing the person of the previous convictions and serve a copy of the information upon him. The information shall be filed within two years after the last conviction, and a copy served on the defendant 30 days before any further proceedings are taken in court." ORS 168.040.

The statute does not require a district attorney to "immediately investigate" unless he has "reason to believe" that there are previous convictions. But if he has such "reason to believe," he must immediately investigate and if it is then determined, as provided by statute, that there were previous convictions, the mandate of the statute requires that he file an information. It must be observed that the delegation of "unbridled discretion" which was condemned in *State of Oregon v. Cory*, 204 Or 235, 282 P2d 1054 was a delegation to the district attorney. That case did not condemn delegation to a judge of discretion as to the sentence to be imposed. It is true that a statute may provide a "mechanistic" rule to take the place of the

discretionary powers of the judge. In *Castle v. Gladden*, 201 Or 353, 270 P2d 675, the statute (OCLA, § 26-2803) did impose such a mechanistic rule when it made the imposition of a life sentence mandatory on a fourth felony conviction. But no constitutional provision required that the legislature should do so.

The history of the habitual criminal law will aid in the consideration of this case. The act was adopted by Chapter 334 of the Laws of 1927 (OCLA, § 26-2801). Under that statute the district attorney had a mandatory duty to file the information "if it shall appear" that the defendant "has previously been convicted of crimes", etc. The amendment of 1947, Chapter 585, Section 4, somewhat altered the duty of the prosecutor. By that law it was provided that if within two years after conviction the district attorney "shall have reason to believe" that the defendant has been previously convicted, the duty to investigate was imposed, and if the fact of previous conviction is determined by "any competent evidence" it became his mandatory duty to file an information. In 1951 this section of the 1947 act was again amended. Oregon Laws, Chapter 383, Section 4. As thus amended, the statute imposed the duty to investigate if the district attorney "has reason to believe" that there have been previous convictions. But for the first time it was provided that if on investigation "it shall be determined by any competent evidence that the person has been so previously convicted, said district attorney in cases of crimes involving violence or threat of violence to person, shall, *and in other cases may*, immediately file an information * * *." (Emphasis ours.) Oregon Laws 1951, Chapter 383, page 608.

■ Defendant's brief refers to the "present habitual criminal law which went into effect after the Oregon

court had declared the prior law unconstitutional." We call attention to the fact that only one part of the law of 1951 was declared unconstitutional. The case to which counsel referred is *State v. Cory*, supra. In that case defendant was not convicted of a crime of violence or threat of violence. The only ruling made in that case, so far as concerns the validity of the statute, was that in cases not involving personal violence, the portion of the statute reading "and in other cases, may" is unconstitutional as vesting unbridled discretion in district attorneys contrary to the Equal Protection clause of the Constitution. The ruling of this case is limited to this narrow area. It does not even raise an inference that there is any violation of the Equal Protection Clause in a statute imposing a mandatory duty upon a district attorney to file an information in cases specified by the legislature, and there is certainly no inference that there is anything unconstitutional in habitual criminal statutes whether they impose a discretionary power upon a court to pronounce an increased sentence upon a habitual criminal or impose a mandatory duty to pronounce a specified term of imprisonment in such cases. Judicial discretion is of the essence of the judicial process and may validly be exercised within the limits set by law.

Continuing our review of the legislative changes in the Habitual Criminal Law, we find that the latest amendment was made by Laws of 1955, Chapter 663. *State v. Cory* was decided on 20 April 1955. The defect in the 1951 law was cured by the 1955 law which went into effect on 25 May 1955. The usual and necessary delay occurred between the end of the legislative session and the publication of the 1955 volume of Oregon Laws, concerning which we will later comment.

The 1955 law, now ORS 168.010 et seq, reimposes

the mandatory duty upon district attorneys to file an information, which duty arises only on the following conditions, namely (1) if within two years after conviction he "has reason to believe that the convicted person has previously been convicted", and (2) "If upon investigation, it is determined by competent evidence that the person has been so previously convicted * * *." Under the present more lenient statute the court is given discretion as to the sentence to be imposed in all cases, whether the sentence be for a second, third, fourth or subsequent offense. In each case the discretion is limited within minimums and maximums prescribed.

■ In the case at bar defendant was sentenced for burglary, having been twice previously convicted of felonies. The wording of the statute is unfortunate, but its meaning is clear. The provision is that he shall be sentenced "for a term not less than, nor more than three times, the longest term prescribed for the offense for which such person is last convicted." ORS 168.021. If the legislature had intended to provide a mandatory sentence of three times the longest term prescribed for the offense, it would have said so in plain language. It is obvious that throughout the 1955 law the expressed policy was to give discretionary power to the judge within upper and lower limits prescribed. In the pending case the provision for a third conviction was a sentence of not less than the longest term prescribed for the offense and not more than three times the longest term so prescribed. The trial court exercised its discretion and sentenced the defendant to 10 years, which was within the statutory limits.

■ We have reviewed the statutory and judicial history of the Habitual Criminal Act for another purpose, now to be mentioned. That history will in part

explain the statistics which indicate an apparent wholesale failure by prosecuting officers to enforce the law as at present written. From April 1951 until the decision in *State of Oregon v. Cory,* supra, on 20 April 1955, the statute purported to vest in the district attorneys discretion in most cases as to whether or not to file informations under the act. After that decision there was reasonable doubt as to what was their duty in cases other than those involving violence. The mandatory duty became clear and well-known only with the publication of the 1955 statutes. Furthermore, as we have pointed out, even under the 1955 statute the filing of informations under the statute is far from being a mere ministerial act. Investigation is required only if the district attorney within two years has reason to believe that the person has "previous convictions" coming within the purview of the act, and an information must be filed only if upon investigation it is determined by competent evidence that the person has been so previously convicted. Again, the statistics submitted to us fail to indicate whether or not the two-year period accorded to the district attorneys within which to file informations has expired. It may well be that informations will yet be filed in cases coming within the statute. In pointing out these elements which may partially explain the failure to inform against habitual criminals we do not mean to intimate that there has not been some inexcusable laxness in the enforcement of this law. There have certainly been many instances in which the clear duty to investigate was imposed and when investigation would have clearly required the filing of an information. For example, when any warden or officer named in ORS 168.050, pursuant to the duty imposed upon him by that section, reports to the district attorney that a convicted person

has been previously convicted within the meaning of the Habitual Criminal Act, it immediately becomes the duty of the district attorney to investigate and act as required by statute. The extent to which an enhanced sentence should be imposed is for the decision of the judge. The duty of the prosecutor is to submit the case—not to determine either the wisdom of the statute or the mode of its exercise by the court. We do find that there has been laxity in the enforcement of the habitual criminal law but mere laxity is not and cannot be held to be a denial of the equal protection of the law. If the failure of prosecutors to enforce the criminal laws as to some persons should be converted into a defense for others charged with crime, the result would be that the trial of the district attorney for nonfeasance would become an issue in the trial of many persons charged with heinous crimes and the enforcement of law would suffer a complete breakdown. Our conclusion is supported by the following cases in which it was claimed that there was discrimination in the enforcement of the Habitual Criminal Act: *Sanders v. Waters*, 199 F2d 317; *Skinner v. Prather*, 136 Kan 879, 18 P2d 154; *People v. Johnson*, 412 Ill 109, 105 NE2d 766; *People v. Israel*, 91 Cal App2d 773, 206 P2d 62. See also, *State v. Waterhouse*, 209 Or 424, 307 P2d 327; *Borders v. Alexander,* 183 Or 488, 194 P2d 414; *Macomber v. State et al.,* 181 Or 208, 180 P2d 793; and, *State v. Moore* and *State v. Smith,* both supra.

In the light of these decisions and those previously cited herein, we hold that the statute is constitutional and we approve of the statement from the bench by the trial judge, who said:

"There has been no showing of any collusion between District Attorneys or design to it showing,

if there has been any. It is, in fact, rather widespread neglect, which so far as the present statute is concerned could even yet be corrected during the period ending with the two years after the enactment of the statute or the two years after the last conviction of persons since the enactment of the last statute. * * *"

The defendant has cited numerous cases involving the application of the Equal Protection Clause of the Federal Constitution. Among them are decisions condemning discrimination on account of race or color. See, *Chambers v. Florida*, 309 US 227, 84 L Ed 716; *Norris v. Alabama*, 294 US 587, 79 L Ed 1074; *Tarrance v. Florida*, 188 US 519, 47 L Ed 572; *Ex parte Virginia*, 100 US 339, 25 L Ed 676, and the famous case of *Yick Wo v. Hopkins*, 118 US 356, 36 L Ed 220, involving discrimination against Chinese laundrymen. Other cases cited by defendant relate to discrimination favoring farmers as a class, discriminatory regulation of the use of the streets, the issuance of licenses, election procedures, tax assessments, Sunday laws, and discrimination against paupers in criminal prosecutions. See, *Taylor v. City of Pine Bluff, Ark*, 289 SW2d 679; *City of Covington v. Gausepohl*, 250 Ky 323, 62 SW2d 1040; *City of Pierce v. Schramm*, 116 Neb 263, 216 NW 809; *Wade v. San Francisco*, 82 Cal App2d 337, 186 P2d 181; *Snowden v. Hughes*, 321 US 1, 88 L Ed 497; *Mayflower Farms v. Ten Eyck*, 297 US 266, 80 L Ed 675; *Sunday Lake v. Wakefield*, 247 US 350, 62 L Ed 1154; *Glicker v. Michigan Liquor Commission*, 160 F2d 96 (6th Cir). We have examined all of these cases and find none which resembles the case at bar. The leading case on the subject is *Yick Wo v. Hopkins*, supra, which established the rule that "Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by

public authority with an evil eye and an unequal hand so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." The facts to which the foregoing language was applied showed a clear intentional discrimination against Chinese. A similar rule has been invoked in other cases in which there has been an intentional arbitrary and unreasonable discrimination against some defined class of persons.

The contention of the defendant, based as it is on the Yick Wo doctrine, is well-answered in *People v. Montgomery*, 47 Cal App2d 1, 117 P2d 437, 446, as follows:

"* * * Appellant argues that the Yick Wo case and others upholding the fourteenth amendment to the Constitution of the United States are to the effect that no person shall be denied the equal protection of the laws, stating: 'Thus, where officials dicriminate and prosecute one and not the other for the same act, there is a denial of protection of the laws under the fourteenth amendment, and the prosecution is therefore void.' Appellant misconstrues the purport of such decisions as that of the United States Supreme Court in the Yick Wo case. It should be borne in mind that in the Yick Wo case the equal protection of the law was extended to persons of a particular race to enable them to engage in a lawful business on a basis of equality with all other persons. Appellant now in effect argues from this that equal protection should also be extended to any person to enable him to commit a crime on a basis of equality with all other persons. While all persons accused of crime are to be treated on a basis of equality before the law, it does not follow that they are to be protected in the commission of crime. It would be unconsciona-

ble, for instance, to excuse a defendant guilty of murder because others have murdered with impunity. The remedy for unequal enforcement of the law in such instances does not lie in the exoneration of the guilty at the expense of society. Applying the rule to the instant case, there is an obvious distinction between extending protection to persons of the Chinese race in pursuit of the harmless and somewhat necessary business of laundering and the extension of a like protection to those engaged in the vicious social evil of pandering. Protection of the law will be extended to all persons equally in the pursuit of their lawful occupations, but no person has the right to demand protection of the law in the commission of a crime. In civil matters the distinction is illustrated by the rule that the law will not enforce an illegal contract. If the law will not enforce an illegal contract, neither will it protect a criminal in the commission of his crime. * * *"

See also, *State v. Nease*, 46 Or 433 at 433, 80 P2d 897; *People v. Darcy*, 59 Cal App2d 342, 139 P2d 118; *Saunders v. Lowry*, 58 F2d 158 at 159, and *Sanders v. Waters*, supra, 199 F2d 317.

Defendant has attempted to establish by evidence a conspiracy to wrongfully and intentionally discriminate against him by invoking the Habitual Criminal Act in his case, but not in others. The evidence fails to establish any such concerted and evil action as might bring the case within the purview of the Equal Protection Clause. The trial court committed no error in denying the motion to dismiss. See, *Skinner v. Prather*, supra, 136 Kan 879, 18 P2d 154; *People v. Reese*, 258 NY 89, 179 NE 305, and *People v. Johnson*, 412 Ill 109, 105 NE2d 766.

■ Finally, the defendant contends that "Proceeding by information in an habitual criminal proceeding violates the Oregon Constitutional requirement of in-

dictment by grand jury." The constitutional provision reads as follows:

"No person shall be charged in any circuit court with the commission of any crime or misdemeanor defined or made punishable by any of the laws of this state, except upon an indictment found by a grand jury." Article VII (amended), § 5.

The words "charged * * * with the commission of any crime * * *" refer to the conventional charge accusing a defendant of criminal acts for the commission of which the state seeks to impose punishment. This court has uniformly construed that provision as being inapplicable to an information under the Habitual Criminal Act. If such had not been the construction, the act could never have been applied in this or in many other states.

In *Ex parte Jack Wessens*, 89 Or 587, 175 P 73, referring to the "charge" as used in Article VII (amended), § 5 of the Constitution, this court said, "The 'charge' there meant is one upon which the person accused may be put upon trial and convicted by final judgment." The court was distinguishing between a complaint before a magistrate and a charge of crime before a court which was to determine guilt or innocence, and it was held that the requirement of indictment by a grand jury was inapplicable to the proceeding before a magistrate. Defendant can take no comfort from the language used. We have repeatedly held that an habitual criminal proceeding is a continuation of the original prosecution. It creates no offense and is merely a proceeding to determine the penalty to be imposed for the crime with which he was charged. *Castle v. Gladden*, supra, 201 Or 353, 270 P2d 675. The "charge" of crime by the defendant was based

on an indictment. Only the facts relevant to the extent of punishment were set forth in the information.

It has long been the statutory law of this state that

"* * * where a discretion is conferred upon the court as to the extent of the punishment to be inflicted, the court, upon the suggestion of either party that there are circumstances which may be properly considered in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily" upon testimony. ORS 137.080 to 137.100. See *State v. Ridder*, 185 Or 134, 137, 202 P2d 482.

The procedure under the Habitual Criminal Act whereby circumstances in aggravation of sentence (to-wit, prior convictions) are shown by information, provides a fairer rule than that found in ORS 137.080. So far as any constitutional question is involved, the same evidence could have been received by the court without any information or formal allegation. *People v. Israel*, supra, 91 Cal App2d 773, 206 P2d 62. We have examined all of the cases cited by the defendant upon this issue and find not one which supports his contention. We hold, in accordance with the weight of authority, that the employment of an information instead of an indictment for the purpose of setting forth previous convictions is not violative of the Constitution.

The judgment and sentence of the trial court is affirmed.